UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION at PIKEVILLE

CIVIL ACTION NO. 7:12-CV-102-KKC

CITIZENS NATIONAL BANK OF PAINTSVILLE,                          PLAINTIFF,

v.                                      **OPINION AND ORDER**

MCNB BANK AND TRUST COMPANY                                DEFENDANT.

* * * * * * * * *

This matter is before the Court on the motions for summary judgment (DE
55, 58) filed by both parties. The parties entered into a total of four agreements
through which the defendant sold the plaintiff an interest in four loans. The issue in
this case is whether the agreements permitted the defendant to unilaterally
terminate the agreements by repurchasing its interest in the loans. Because the
agreements explicitly prohibit such unilateral termination, the plaintiff is entitled
to summary judgment that the defendants breached the agreements. Issues of fact
remain, however, regarding the calculation of the plaintiff's damages.

## I.   **Background**

The four agreements at issue are called "participation agreements." In such
an agreement, there are three principal players: the participant, the lender, and the
borrower. The participant provides funds to the lender and the lender uses those
funds to make loans to the borrower. *See In re Autostyle Plastics, Inc.*, 269 F.3d 726,
736 (6th Cir. 2001).

In this case, the lender was defendant MCNB Bank and Trust Company, the
participant was Citizens National Bank of Paintsville, and the borrowers were four

different entities. The participation agreements were between only MCNB and Citizens. The borrowers were not parties to those agreements. The loan agreements, however, were between MCNB and the four borrowers. Citizens was not a party to those contracts. Thus, Citizens did not enter into any agreement with the borrowers.

Pursuant to the participation agreements, MCNB sold to Citizens a portion of its interest in four commercial loans made to the four different borrowers. (DE 1-1, Agreement, ¶ 1.) The parties refer to the loans as the Weston Lodging Loan, the Greenbrier County Loan, the Jackson County Loan, and the American Pride Loan. The language of the four participation agreements is identical except for the description of the underlying loan. In this opinion, the Court will cite to the agreement dated January 19, 2007, which the parties have denominated the "Weston Lodging Agreement." (DE 1-1, Agreement.)

The total amount of the four loans was approximately $19 million and all were made for the construction of hotels in West Virginia. In total, Citizens paid MCNB about $ 6 million for its interest in the four loans.

There does not appear to be any dispute that MCNB sold Citizens an interest in the loans in order to comply with statutory lending limits on the dollar amount of loans any single bank can make to a single borrower or affiliated borrowers. (DE 59, Mem. at 2-4.) MCNB offered for Citizens to purchase the amount of the loan that was above MCNB's lending limit. Citizens agreed to purchase the interest in the loans because it was facing a weak demand for loans in Eastern Kentucky. (DE 59, Mem. at 3.)

The loans were for varying terms ranging from five to 21 years. The American Pride loan matured August 5, 2014. The Weston Lodging, Greenbrier, and Jackson County loans matured in 2028, 2029, and 2030, respectively. (DE 55-1, Mem. at 17.) Citizens purchased varying percentages in the four loans, ranging from 19.13% to 68.53%.

Citizens argues that it believed when in purchased the interest in the loans, it would receive payments of its portion of the principal and interest for as long as the borrower made payments on the loan. Thus, for example, it believed it would receive its portion of the payments made by Weston Lodging on the Weston Lodging agreement for as long as Weston Lodging made those payments, which could be up until February 1, 2028, the maturity date of that loan.

That is not what happened. Instead, before the maturity date of the loans, MCNB wired Citizens an amount equal to Citizens' percentage in the outstanding loan principal balances at the time and Citizens' percentage of the interest that had accrued at that point. The payments totaled roughly $5.3 million. These payments were wired on December 2, 2011 for the Weston Lodging Loan and on July 13, 2012 for the other three loans. None of the underlying loans had been paid off at that point. The borrower on each of these loans remained obligated to continue paying the principal and interest due on the loans. MCNB argues, however, that Citizens' right to any portion of those payments has been terminated because MCNB repurchased Citizens' interest in the loans and, thus, Citizen no longer has any rights to amounts paid by the borrower.

3

The same date that MCNB wired Citizens the money, it entered into participation agreements with another bank, selling the new bank a percentage interest with regard to all of the loans except the Weston Lodging loan. (DE 55-1, Mem. at 5.)

MCNB argues that it decided to repurchase Citizens' participation interest in the four loans because it had entered into another participation loan with Citizens that went badly. (DE 55-1, Mem. at 5.) On that loan, Citizens was the original lender and MCNB was the participant. The borrower defaulted on that loan. Lee Ellis, MCNB's CEO during the relevant time period, testified that MCNB and Citizens disagreed about how to handle the defaulted loan and that the transaction left a "bad taste in [MCNB's] mouth with respect to Citizens." (DE 55-7, Ellis Dep. at 67-68.) Ellis testified that ending its relationship with Citizens under the loans also made sense because, at that point MCNB "had more borrowing capacity under the legal lending limits that we did previously." (DE 55-7, Ellis Dep. at 67.)

The issue in this case is whether MCNB breached the agreements by purporting to repurchase Citizens' interest in the loans and ceasing to make any further payments to Citizens.

II.   **Analysis**

The American Pride participation agreement is governed by West Virginia law. The other three agreements are governed by Virginia law.

Under either law, in a contract interpretation case, the first thing the Court must do is determine whether the contract is ambiguous on the matter at issue, looking only to the face of the document. *Nehi Bottling Co., Inc. v. All-American*

*Bottling Corp.*, 8 F.3d 157, 162 (4th Cir. 1993) (Virginia law); *Covol Fuels No. 4, LLC v. Pinnacle Min. Co., LLC*, 785 F.3d 104, 111-12 (4th Cir. 2015) (West Virginia law). A contract is facially ambiguous on an issue if it is "reasonably susceptible of two different meanings" or if "reasonable minds might be uncertain or disagree as to its meaning." *Covol Fuels*, 785 F.3d at 111-12 (quoting *Estate of Tawney v. Columbia Natural Res., LLC*, 633 S.E.2d 22, 23-24 (W.Va. 2006). *See also*, *Nehi Bottling Co.*, 8 F.3d at 161 ("The Supreme Court of Virginia has defined ambiguity as 'the condition of admitting of two or more meanings, of being understood in more than one way, or of referring to two or more things at the same time.'")

"If the contract is unambiguous, then the court should enforce its terms according to the plain and natural meaning of the language used without considering extrinsic evidence." *Covol Fuels*, 785 F.3d at 112. *See also Nehi Bottling Co.*, 8 F.3d at 161.

The participation agreements are not ambiguous. MCNB was required to pay Citizens its share of the payments made by the borrower on the loan at issue for as long as the borrower made such payments. This is clearly stated in paragraph 7 which provides:

> [MCNB] shall report to [Citizens] [Citizen's] share of all accrued interest, fees, payments other than principal amounts and all principal sums collected and, *so long as no default shall exist with respect to the Loan, promptly remit its share to [Citizens]. . . .*"

(DE 1-1, Agreement, ¶ 7) (emphasis added.)

Furthermore, the agreements explicitly prohibit either party from unilaterally terminating the agreement. Paragraph 18 explicitly states, "[n]o

amendment, change, modification or termination of this Agreement shall be valid or binding upon the parties hereto unless such amendment, change, modification or *termination shall be in writing and signed by both parties*." (DE 1-1, Agreement, ¶ 18) (emphasis added.)

In support of its argument that, despite this clear language, it has a right to unilaterally terminate the participation agreements at any time, MCNB relies on a phrase in paragraph 8 of the agreement. (DE 55-1, Mem. at 9-10.) That paragraph sets forth MCNB's obligation under the agreement. It provides that MCNB is obligated to hold the original promissory notes and any other loan documents; receive all payments from the borrower; and, to the extent that MCNB actually receives those payments, pay Citizens its share.

MCNB points out that paragraph 8 states that these obligations continue only until Citizens' "Participation interest in the Loans has been repaid in full." MCNB argues that this provides a way to unilaterally terminate its obligations under the contract. It argues that its obligations under paragraph 8 cease no matter how Citizens' participation interest is repaid. Repayment could occur by the borrower paying off the underlying loan or, MCNB argues, as it did here, by MCNB's unilateral action of making a lump-sum payment of the principal funds advanced by Citizens and any interest that Citizens was entitled to on the date of the repayment. (DE 55-1, Mem. at 10.)

It is true that the provision does not specify that MCNB's obligations continue until the *borrower* has repaid the loan but, given the explicit termination provision, this is the only reasonable interpretation. Again, the provision of the

agreement that specifically addresses the parties' termination rights provides that it can be terminated only by a writing "signed by both parties." (DE 1-1, Agreement ¶ 18.)

MCNB argues that its repurchase of Citizens' interest on the loans should not be viewed as a termination of the agreement. Instead, it argues that the repurchase should be viewed "as the exercise of a right in the Participation Agreements, which then causes MCNB to be relieved of its obligations thereunder. The termination which subsequently occurs is a result of the Participation Agreements' own term." (DE 55-1, Mem. at 11.)

Even under this argument, repurchase results in termination of the agreements. Regardless, the Court must interpret the contract "according to the plain and natural meaning of the language." *Covol*, 785 F.3d at 112. Paragraph 18 clearly prohibits either party from unilaterally terminating the agreement. Thus, paragraph 8 cannot be read to permit MCNB to unilaterally terminate the agreement at any time by repurchasing Citizens' interest in the loans.

MCNB appears to argue that other provisions of the agreement permit the parties to unilaterally terminate the agreement at any time despite the prohibition in paragraph 18. It points to paragraph 10 which addresses the parties' rights and obligations if the borrower defaults and their rights and obligations in the event of foreclosure on the collateral. This provision does not provide either party with a right to unilaterally terminate the agreement and, thus, is not inconsistent with paragraph 18.

MCNB also points to paragraph 13 which addresses Citizens' remedies if MCNB should breach the agreement. It provides that, in the event of such a breach, Citizens has the "unilateral right (but not the obligation) to sell to Originating Bank . . . its Participation Interest for an amount equal to the aggregate of all principal, interest, fees and other sums due with respect to its Participation Interest." As will be discussed below, this provision is striking because it demonstrates the explicit language the parties chose to employ in granting a party the right to unilaterally cause MCNB's repurchase of Citizens' participation interest. The parties granted that right to Citizens, however, and not to MCNB.

Further, paragraph 13 is not inconsistent with the termination prohibition in paragraph 18. Paragraph 13 does not grant Citizens a unilateral right to terminate the agreement at any time. Instead, it grants Citizens the right to cause MCNB to repurchase its interest if a specific event occurs: MCNB's default. In contrast, MCNB argues that paragraph 8 grants it the unilateral right to cause the termination of the agreement at any point. Paragraph 18 explicitly prohibits that.

Other portions of the agreement make clear that the parties did not intend that MCNB could repurchase its interest in the loans at any time. The agreement explicitly provides that MCNB is *selling* Citizens a portion of MCNB's interest in the loans. (DE 1-1, Agreement ¶ 1.) The parties state that the agreement was motivated by MCNB's "desire[] to sell" and Citizens' "desire[] to purchase" an interest in MCNB's "right, title and interest" in the underlying loan.  (DE 1-1, Agreement, Whereas Clause.) The agreement makes clear that MCNB is conveying Citizens "title" to an interest in the loans. (DE 1-1, Agreement, Whereas Clause,

8

¶¶1, 2.) Further, the agreement explicitly provides that is "shall be construed" as conveying to title to the participating interest and as creating a purchaser-seller relationship between the parties. (DE 1-1, Agreement, Whereas Clause, ¶2.)

MCNB agrees that it sold Citizens an interest in the loans. (DE 68, Response at 18.) It argues, however, that the agreement contains certain explicit limitations on the sale. (DE 68, Response at 18-19.) It cites provisions of the agreement that explicitly appoint MCNB as the party that will hold the notes and other loan documents and receive all payments from the borrower. (DE 1-1, Agreement, ¶¶8, 16(a).) The agreement also explicitly states that MCNB, subject to the provisions of the agreement, retains "all rights with respect to enforcement, collection and administration of the Loan and the security underlying the Loan." (DE 1-1, Agreement, ¶ 16(c).)

The problem is that the agreement contains no such explicit provision that permits MCNB to unilaterally terminate the agreement by repurchasing the interest in the loans that it conveyed to Citizens.  Paragraph 13 demonstrates the kind of language the parties employed to grant such a right. As discussed it explicitly provides that, if MCNB should default on its obligations under the agreement, then Citizens shall "have the unilateral right. . . to sell to [MCNB]. . .its Participation Interest for an amount equal to the aggregate of all principal, interest, fees and other sums due with respect to its Participation Interest. . . ." The parties employed no such language with regard to MCNB's repurchase of Citizens' interest.

MCNB points to this provision and argues, even if it did breach the agreement, Citizens' remedy is found in paragraph 13. Citizens can cause MCNB to

repurchase its interest in the loans. MCNB argues that it has already repurchased its interest and, thus, Citizens cannot prove any damages. There are two problems with this argument.

First, the provision states that Citizens' unilateral right to require MCNB to repurchase Citizens' interest in the loan is not its only remedy if MCNB breaches the agreement. Citizens has "all other remedies available to it at law or in equity." (DE 1-1, Agreement, ¶13.) Second, Citizens argues that, even under this provision, MCNB must pay it all the interest that the borrower would pay under the loan. The provision requires MCNB to pay "the aggregate of all principal, interest, fees, and other sums due with respect to its Participation Interest." (DE 1-1, Agreement, ¶ 13.) This could mean that MCNB must pay Citizens all the interest "due" it for the life of the underlying loan. It could also mean that MCNB was only required to pay Citizens the amount "due" at the time of the forced repurchase. Accordingly, the provision is ambiguous and no party has pointed to any extrinsic evidence that clarifies the meaning of this provision.

MCNB also argues that, even if it did breach the agreement, it is entitled to summary judgment because Citizens cannot establish damages. It argues that Citizens' claim for damages is speculative because its calculation assumes that the borrowers on the underlying notes would have continued to make payments on the loans until the maturity date of each loan. MCNB argues that such damage calculations "would require utter speculation regarding what the borrowers and/or MCNB may do in the future, and also regarding how market interest rates may fluctuate in the future." (DE 55-1, Mem. at 19.)

10

"[D]amages are not required to be proved with mathematical exactness." *Thomas P. Harkins, Inc. v. Reynolds* Associates, 277 S.E.2d 222, 224 (Va. 1981). "[A]n intelligent estimate or a reasonable basis of calculations is all that is required." *Id. See also Stafford EMS, Inc. v. J.B. Hunt Transport, Inc.*, No. 2:02-0886, 2009 WL 483967, at *4 (S.D. W.Va. 2009.) Citizens has presented a calculation of damages that provides a jury with a reasonable basis to determine damages. (DE 59-30, Calculation of Damages; 59-11, G. Stewart Report; 59-31, G. Stewart Rebuttal.)

MCNB also argues that Citizens did not make a good-faith effort to avoid damages.  For this argument it relies on the Restatement (Second) of Contracts which provides:

> (1) Except as stated in Subsection (2), damages are not recoverable for loss that the injured party could have avoided without undue risk, burden or humiliation.
>
> (2) The injured party is not precluded from recovery by the rules stated in Subsection (1) to the extent that he has made reasonable for unsuccessful efforts to avoid loss.

Restatement (Second) of Contracts §350.

MCNB argues that Citizens' damages calculation assumes that the funds paid to it by MCNB remain in Citizens' account at the Federal Reserve Bank of Cleveland earning only .25% annually for the entire period of the underlying loans. MCNB argues this is not a good faith effort by Citizens to avoid damages. It argues that other investment options were available at the time of each repayment that would have provided a yield of eight times that of the Federal Reserve account.

11

These arguments involve factual issues that must be resolved by a jury. Accordingly, Citizens' motion for summary judgment will be denied to the extent that it asks the Court to grant it damages.

III. **Conclusion**

For all these reasons, the Court hereby ORDERS as follows:

1) Citizens' motion for summary judgment (DE 58) is GRANTED in part and DENIED in part. The motion is GRANTED to the extent that it moves for summary judgment on the issue of whether MCNB breached the participation agreements by unilaterally terminating them and ceasing to pay Citizens as required under the agreements. The motion is otherwise denied; and

2) MCNB's motion for summary judgment (DE 55) is DENIED.

Dated September 30, 2015.

KAREN K. CALDWELL, CHIEF JUDGE
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY